Lawrence E. MIDDAUGH, as Administrator of the Estate of Stephen Athan, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. No. 5148.

United States District Court
D. Wyoming.

May 29, 1968.

J. F. Mahoney, Casper, Wyo., and Norman S. Berliner, Los Angeles, Cal., for plaintiff.

Robert N. Chaffin, U. S. Atty., for District of Wyoming, for the United States of America.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KERR, District Judge.

The above entitled matter having come on regularly for hearing before the Court, and the Court having examined the evidence adduced for and on behalf of the plaintiff and the evidence adduced for and on behalf of the defendant, took said matter under advisement; and having examined the record on file herein, and having studied the authorities submitted by counsel on behalf of plaintiff and on behalf of the United States of America, and being fully advised in the premises, the Court does hereby make its Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. This action is brought under authority of the wrongful death statutes of the State of Wyoming, § 1–1065 and § 1–1066, W.S.1957, against the United States pursuant to the provisions of the Tort Claims Act, 28 U.S.C. § 1346.

2. The plaintiff is a citizen and resident of Natrona County, Wyoming, and is the duly appointed, qualified and acting Administrator of the Estate of Stephen Athan, Deceased, Probate #9704 in the District Court, Seventh Judicial District, Natrona County, Wyoming.

3. The decedent, a resident of California, was killed by a falling lodge pole pine tree at a designated campsite in the Lewis Lake Campground, Yellowstone National Park, State of Wyoming, on July 2, 1966, at about 5:30 p. m.

4. Yellowstone National Park was opened to the public for the tourist season of 1966 on May 1, 1966. Lewis Lake Campground was opened to the public for the summer season on June 10, 1966.

5. The decedent, driving the personal family car and accompanied by his wife and three year old daughter, entered Yellowstone National Park through the south entrance in the late afternoon of July 2, 1966. He was required to and did pay a $7.00 fee for which he received a "golden pass" which permitted him to enter the Park and other Federal recreational areas.

6. The decedent, who desired to camp in the Park, was directed by a Park Service Ranger to the Lewis Lake Campground approximately twenty-one miles north of the Park entrance. He drove via a main Park road to that campground where several vacant "walk-in" campsites were available. He chose site #W-9 located 60 feet to 75 feet from the road leading into the campground, said site being one of the eighteen authorized campsites to which campers are confined. With the assistance of his wife and other campers, he carried his camping gear, food and other belongings to campsite #W-9 where he erected his tent.

7. No camping is permitted in Yellowstone National Park outside designated campgrounds and the Lewis Lake Campground is equipped with water hydrants, outdoor toilet facilities and fireplaces.

8. Within moments after the tent was erected and while decedent was standing therein, the tree collapsed and fell striking the tent and the decedent causing injuries to Stephen Athan from which he died within a few hours while enroute in a Park Service ambulance to the Yellowstone Lake Hospital.

9. The tree which fell and killed the decedent collapsed approximately 20″ from ground level, was approximately 70′ in length and 13″ in diameter at the point where the collapse occurred. It was approximately 300 years old and stood about 50′ from the decedent's campsite. Prior to the time the tree fell, it was immediately adjoined by a smaller twin tree which was removed after the accident by person or persons unknown. A twin, or bifurcated, tree such as this one is suspect as being dangerous.

10. The Lewis Lake Campground is in the Snake River Subdistrict in Yellowstone National Park. The ranger in charge of the Snake River Subdistrict for the tourist seasons extending from 1964 through 1967 was Ranger Raymond L. Ives.

11. Subdistrict Ranger Raymond L. Ives, Park Service Ranger in charge of the Lewis Lake Campground arrived at the scene of the accident ten to twenty minutes after it occurred. At a later time, he observed a "cat face" at the base of the tree which had fallen. A "cat face" is a wound or injury to a tree which can be caused by various sources resulting in an opening or depression into the tree. This condition was clearly visible to Ranger Ives when he inspected the scene of the accident.

12. Ranger Ives testified that if he had observed the "cat face" on this tree prior to the accident, he would have investigated further into the condition of the tree, and that if he had discovered the tree's decayed condition, he would have caused it to be removed as a hazardous tree. Ranger Ives did not know whether any other government employee had inspected this tree.

13. Failure of this tree was a collapse as distinguished from a rupture. In the case of a collapse, the tree falls because of weakness and does not need the application of severe external forces which cause a rupture.

14. Examination of the tree June 23, 1967, which still lay as it had fallen with the exception that the crown portion of the tree had been removed, showed the occurrence of a rust canker affecting the same side of the tree and facing in the same direction in which it fell, the open part of the canker extending 50″ above the ground. The canker, which appeared to have been present at least 75 years, resulted in a flattening of the affected portion. Beneath the canker was the opening, or "cat face", extending into the tree through what would normally have been the heartwood, which hole contained rot, insect chewings and related material. Approximately 70% of the tree had rotted away. The hole at the base of the tree provided an entry court for diseases and forest insects and resulted in the advanced and incipient decay. At the point where the collapse occurred, the tree was in an advanced state of decay which had severely weakened it.

15. The basal hole in the tree had weakened it in the same manner as an undercut placed by a tree faller causing it to fall in the direction in which it fell.

16. The basal hole in the tree was clearly visible and should have been discovered by routine inspection of the Campground for hazardous trees leading to further inspection and investigation and removal thereof because of its hazardous condition.

17. It is the admitted policy of the National Park Service to inspect all campgrounds for dead and diseased trees and to remove those which might constitute a hazard to campers.

18. Subdistrict Ranger Ives did not inspect the tree in question at any time prior to its collapse.

19. Seasonal Ranger Barton, who was stationed at Lewis Lake Campground in the summer of 1966 arrived at Lewis Lake Campground on July 1, 1966. He drove through the campground on the morning of July 2 in a motor vehicle. Ranger Barton did not inspect the tree which fell but examined it after the collapse and testified that he was surprised at the interior condition of the tree at the point of collapse as opposed to its exterior. Ranger Barton is a mathematics teacher by profession and, including the summer of 1966, worked at Lewis Lake Campground for three summers. He stated, in referring to his background as a Ranger, "I haven't had much experience".

20. One of the Government witnesses, Ranger Lowell White, has been a Park Forester since September 1966. When his attention was directed to the decay shown in plaintiff's Exhibit 3, he described it as "pretty bad".

21. The tree was in fact hazardous to campers and other visitors at the time it fell and killed the decedent.

22. The weather in the vicinity of Lewis Lake Campground at the time the tree fell was normal for the season and the wind was moderate and blowing from the southwest, opposite to the direction in which the tree fell. No other trees fell on July 2, 1966, in the Lewis Lake Campground.

23. The decedent was happily married and had a minor daughter aged three years. At the time of his death the decedent was 39 years of age, a holder of a degree in electrical engineering and employed as such by North American Rockwell Aviation Company. His income tax returns from 1961 through 1965 showed a gross salary starting at $8,692.38 and increasing to $12,558.36 for the year 1965; his 1966 income tax return covering the first six months prior to his death showed an annual salary of $14,271.08. He was rated by his supervisor as being in the top 25% of the engineers employed by North American Rockwell and could have been expected to gain an increase in his salary within a few years of from $1400 to $2,000 per month.

24. Dr. Curtis Cramer, Economist, University of Wyoming, Laramie, Wyoming, testified concerning the electrical engineering profession in which the decedent was engaged at the time of his death, and the employment and wage conditions of such profession.

25. The life expectancy of the decedent, based upon the mortality tables appearing at pages 586 and 587, Volume 1, W.S.1957 at the age of 39, was 30.8 to 32.06 years.

26. The funeral bill incurred by the decedent's widow was $1,304.52.

27. The United States of America failed to provide a safe place for the decedent to camp in that the opening near the base of the tree was clearly visible to the officials of the National Park Service had they looked, and a further examination of the tree would have disclosed that the trunk of the tree was in an advanced state of decay. The failure of the United States to provide a safe camp site was the sole and proximate cause of the death of the plaintiff's decedent, Stephen Athan.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the subject matter and the parties.

2. Plaintiff's intestate, the decedent Stephen Athan, was an invitee in Yellowstone National Park to whom the United States owed the duty to use ordinary and reasonable care to keep the premises reasonably safe for his visit and to warn him of any hidden danger.

3. The Government, as landowner, is required to have a superior knowledge of dangers which would not be obvious to the invitee if such dangers are discoverable in the exercise of due care.

4. A danger existed to the decedent and other invitees which should have been known to the Park employees. It was the Government's duty to have removed the hazard or to make an honest disclosure of the danger to the decedent so as to afford him an opportunity for an intelligent choice as to whether he wished to incur the risk incident to coming upon the land.

5. The collapse of the tree which killed the decedent was not due to an Act of God, which is an injury due directly and exclusively to natural causes without human intervention which could not have been prevented by exercise of reasonable care and foresight.

6. The Government, as owner and proprietor of Yellowstone National Park, was charged with the duty to inspect and to guard against injury to invitees drawn thereto since the tree was under the exclusive custody, control and management of the proprietor.

7. The invitation extended to public invitees encourages visitors to enter upon the land with a sense of assurance

that it has been prepared for their safety.

8. The decedent did not assume the risk of camping where he was directed to go and was not guilty of any contributory negligence.

9. The United States of America was negligent in the performance of its duties and such negligence was the sole and proximate cause of the death of plaintiff's intestate, Stephen Athan.

10. The United States of America is liable to plaintiff and judgment should be entered in favor of the plaintiff and against the defendant in the sum of $43,750.00, which sum will reasonably compensate the survivors for the amount which they failed and will fail to receive and for the loss they sustained and will sustain by reason of the death of the decedent, together with death of the decedent.